T.C. Memo. 1999-271


UNITED STATES TAX COURT


JON L. STOLTE AND ESTHER J. STOLTE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 22988-97.                    Filed August 12, 1999.


<u>Robert C. Zack</u> and <u>Eric T. Weiss</u>, for petitioners.

<u>Alexandra E. Nicholaides</u>, for respondent.


MEMORANDUM OPINION


LARO, <u>Judge</u>:  Petitioners petitioned the Court on November
26, 1997, to redetermine respondent's determination of
deficiencies in petitioners' Federal income tax for 1987 through
1990.  By notice of deficiency dated September 3, 1997,
respondent determined petitioners had unreported income resulting

from payments petitioner Jon L. Stolte[1] received under two disability policies. The resulting deficiencies in income tax, additions to tax, and penalties are as follows:

| Year | Deficiency | Additions to Tax | | Penalty |
| | | Sec. 6653(a) | Sec. 6661 | Sec. 6662 |
| --- | --- | --- | --- | --- |
| 1987 | $12,472 | $624 | $3,118 | |
| 1988 | 5,371 | 269 | 1,343 | |
| 1989 | 6,274 | | | $1,255 |
| 1990 | 6,263 | | | 1,253 |

After concessions by petitioners, the sole issue for decision is whether certain payments received by petitioner may be excluded from petitioners' gross income under section 105(c). We hold they may.

Unless otherwise stated, section references are to the applicable versions of the Internal Revenue Code, and Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

Some of the facts are stipulated and are so found. Petitioners resided in Bloomfield Hills, Michigan, when they filed their petition. Petitioner is 64 years old and received his license as a medical doctor in 1972. Petitioner practiced medicine as an employee of his wholly owned corporation, Jon L. Stolte, M.D.P.C. (P.C.), from 1972 through 1990. During most of

---

[1]All singular references to petitioner are to petitioner Jon L. Stolte unless otherwise indicated. Petitioner Esther J. Stolte is a party to this proceeding due to filing a joint Federal income tax return with petitioner.

his career, he specialized in general surgery but also practiced general medicine. Petitioner served as deputy medical examiner for the county from 1972 to 1993, where his duties included examining deceased bodies and signing death certificates.

In the early 1970's, the P.C. purchased two disability policies for petitioner and paid all premiums on behalf of petitioner. One policy was issued by the Monarch Life Insurance Company ("Monarch policy"), which policy provided generally five different benefit payments based on the type of disability:

|  | Disability | Payment |
|---|---|---|
| (1) | Blindness, loss of 2 extremities[2] | $60,000 |
| (2) | Loss of sight, speech, hearing or 2 extremities | $2,500/month for life |
| (3) | Total disability from transplant | $2,500/month for up to 6 months |

---

[2]The Monarch Policy provided that if petitioner had a sickness or injury that resulted in total and irrevocable loss of the use of both hands, both feet, or a hand and a foot, through severance or otherwise, then, in addition to other benefits payable, petitioner would receive the $60,000 benefit. This benefit was payable even if petitioner could still engage in his regular occupation and even if he did not require regular attendance of a physician.

| | | |
|---|---|---|
| (4) | Total disability from sickness | before age 50; $2,500/month for life, from ages 50-65,minimum $60,000 or $2,500/month, whichever is greater |
| (5) | Total disability from accident | before age 65, $2,500/month for life, after age 65, $60,000 |

The $2,500 per month figure was fixed as of the time the policy was issued except that it may be adjusted by a cost-of-living factor.  Under the Monarch policy, total disability is defined as a sickness or injury requiring regular attendance of a licensed physician, and benefits are payable as long as petitioner is unable to engage in his regular profession as a general surgeon. The Monarch policy contemplates that petitioner is allowed to train for or engage in any other occupation or profession.

The other policy was a group hospital indemnity policy issued by the Provident Life and Accident Insurance Company (Provident policy), which policy provided for payments under the circumstances set forth in the policy which payments varied with the type of illness or disability.

In the early 1980's petitioner suffered from extreme fatigue, recurrent abdominal pain, and flulike symptoms which were ultimately diagnosed as chronic fatigue syndrome.  In 1986, petitioner was diagnosed with a cancerous disease of the lymph glands commonly known as Hodgkin's Disease.  Petitioner began receiving chemotherapy, which continued for approximately 8

months. During chemotherapy, petitioner underwent two surgeries for an obstruction of the bowel. Petitioner's cancer is in remission, but the chemotherapy immediately caused petitioner to suffer peripheral nerve damage in his hands, legs, and feet known as polyneuropathy. Petitioner experienced and continues to experience numbness, weakness, and quivering of the muscles in his hands, legs, and feet. This condition has led to atrophy of the muscles and permanent nerve damage. Petitioner experiences burning in his hands and feet and is unable to stand for extended periods or grasp and hold objects. During 1988, the severity of this condition caused petitioner to fall and break his hip. Petitioner's condition has deteriorated rapidly since 1986, leaving him frail and weak. His condition has been so debilitating that he no longer lives a normal lifestyle and is unable to enjoy most activities in which he previously engaged. Petitioner's condition leaves him too exhausted to be productive during his days, and he spends most of his time resting. His prognosis is poor.

Since 1986, petitioner has been unable to practice as a general surgeon due to the polyneuropathy he suffers. In 1987, petitioner returned to work as a general practitioner on a very limited basis, acting as a primary care doctor for a small number of health maintenance organization patients and spending only a few hours a week at his office. Petitioner continued working in

this limited capacity throughout the years in issue and did a small amount of medical consulting work. Petitioner's polyneuropathy rendered him unable to drive, and he relied on his wife for transportation. With her help, he was able to continue his work as the deputy medical examiner. The P.C. reported gross receipts from 1987 through 1990 ranging from $14,738 to $27,858. These receipts represented payments from petitioner's various medical services and largely related to amounts collected for services rendered prior to 1987.

Petitioner received benefits under the Provident policy in 1987 and 1988 in the amounts of $12,500 and $2,800, respectively. These amounts were calculated in accordance with the above table and were based upon the specific type of injury suffered by petitioner.[3] Petitioner was considered disabled under the Monarch policy from 1986 forward. He received benefits under the Monarch policy in 1987, 1988, 1989, and 1990, in the amounts of $34,320, $31,700, $35,640, and $35,640, respectively. These amounts represented the maximum benefit of $2,500 per month.[4]

---

[3]The daily indemnity amount for each day petitioner was confined in the hospital due to cancer under the Provident policy is 200 percent of $200 or $400 per day. In 1987, petitioner was confined in a hospital for 31.25 days and in 1988 was confined for 7 days.

[4]The $2,500 figure was adjusted each year for a cost-of-living factor.

Petitioners did not report any of these disability payments on their return for 1987, 1988, 1989, or 1990.  Respondent determined that the payments received by petitioner under the Monarch policy and the Provident policy were includable in income.

## Discussion

We must decide whether petitioner, who suffers from a debilitating physical condition, is eligible for the tax benefit Congress intended to confer upon those whose quality of life has been significantly lessened by a severe and permanent physical injury.  Petitioner contends that the disability payments at issue are excludable from his gross income because: (1) They constituted payment for the permanent loss or loss of use of a member or function of the body, in that petitioner has permanently lost the use of the function of his hands, feet, and legs; and, (2) the payments were computed with reference to the nature of the injury without regard to the period petitioner was absent from work.  Respondent, in contrast, argues the payments received by petitioner under the Monarch policy do not satisfy either of the conditions imposed by section 105(c); that the payments received under the Provident policy do not satisfy the first condition of section 105(c); and that the payments under

both policies must, therefore, be included in petitioner's gross income.[5]  We disagree.

Section 105(a) provides in general that amounts received by an employee under accident and health plans funded by the employer are included in the employee's gross income. Section 105(c), however, provides an exception to the general rule:

> (c) Payments Unrelated To Absence From Work.--Gross income does not include amounts referred to in subsection (a) to the extent such amounts--
>
>> (1) constitute payment for the permanent loss or loss of use of a member or function of the body, or the permanent disfigurement, of the taxpayer, * * * and
>>
>> (2) are computed with reference to the nature of the injury without regard to the period the employee is absent from work.

As to the first element of section 105(c), injuries encompassed by the statute fall into three categories:  (1) The permanent loss or loss of use of a member of the body; (2) the permanent loss or loss of use of a function of the body; and (3) permanent disfigurement.  The third category is inapplicable because it refers only to external bodily appearance.  Petitioner must fall under one of the first two categories to prevail. Petitioner bears the burden of disproving respondent's

---

[5]With respect to the Provident policy the parties stipulate and respondent concedes that the second element of sec. 105(c) (relating to whether payments are based on the type of injury and unrelated to absence from work) is satisfied.

determination.  See Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111 (1933).

Injuries included in the first two categories are described in section 1.105-3, Income Tax Regs., which provides in pertinent part:

> For purposes of section 105(c), loss or loss of use of a member or function of the body includes the loss or loss of use of an appendage of the body, the loss of an eye, the loss of substantially all of the vision of an eye, and the loss of substantially all of the hearing in one or both ears. * * *

The term "member" was intended to cover loss of extremities such as arms, legs, or loss of bodily function.  See <u>Hines v. Commissioner</u>, 72 T.C. 715 (1979).  Regarding loss of bodily "function", we look to whether petitioner's condition has left him effectively without the use of his hands, legs, and feet, as opposed to whether his use is partially impaired.  See <u>Hines v. Commissioner</u>, <u>supra</u>.  In <u>Hines v. Commissioner</u>, <u>supra</u>, we considered the application of section 105(c) to a pilot who suffered a heart attack and lost the use of a portion of his heart.  The taxpayer was barred by FAA regulations from returning to his employment.  We considered the function of the heart as a circulatory organ and concluded "petitioner's heart is now functioning normally in that respect" and that "petitioner is now leading a normal life and he may well live out a normal life span in spite of increased risk."  <u>Hines v. Commissioner</u>, <u>supra</u> at

719.  We held the injury to the taxpayer's heart was not the loss of a body function and was not of the type envisaged by section 105(c)(1).

The facts of this case are materially distinguishable from those in Hines, and we hold the impairment petitioner suffers in his hands, legs, and feet due to polyneuropathy is tantamount to the loss of a member or a body function within the meaning of section 105(c).  Unlike the taxpayer's heart in Hines, petitioner's arms, legs, and feet have not functioned normally since he began chemotherapy.  Petitioner's hands and legs fail him frequently and unexpectedly, and he can barely hold objects or stand for any significant period of time.  We find the negative impact on petitioner's quality of life to be of such a degree as rises to the level of severity contemplated by Congress in section 105(c).[6]

Respondent argues petitioner has merely lost his ability to function as a general surgeon and that loss of earning capacity is not equivalent to loss of a body function.  See Hines v. Commissioner, supra; West v. Commissioner, T.C. Memo. 1992-617. While we agree with this legal proposition, we disagree with

---

[6]In Hines v. Commissioner, 72 T.C. 715, 718-719 (1979), we recognized the Congressional intent of sec. 105(c) "was to provide a tax benefit to one who receives a severe physical injury which permanently and significantly lessens the quality of life which he had enjoyed prior to the injury."

respondent's analysis of the facts. We listened to petitioner's credible testimony about his condition from 1986 forward and reviewed documentary evidence of petitioner's condition, which evidence included several letters from physicians who examined petitioner at relevant times.[7] We are convinced that petitioner's condition is severe and permanent and has left him without functional use of his hands, legs and feet. Petitioner's polyneuropathy robbed him not only of his ability to function as a general surgeon but also of his ability to lead the life he enjoyed before his condition. See, e.g., Maller v. Commissioner, T.C. Memo. 1984-614 (wherein the parties stipulated loss of sight was loss of a body function); Berner v. United States, 81-2 USTC par. 9733 (W.D. Pa. 1981) (wherein taxpayer's loss of virtually all respiratory function was loss of a body function). Petitioner has satisfied the first element of section 105(c).

The parties stipulated the second element of section 105(c) for the Provident policy. Regarding the Monarch policy, the payments must be computed with regard to the nature of the injury and must not be computed with regard to the period the employee is absent from work. See sec. 105(c)(2); Hines v.

_____

[7]We also observed petitioner at trial and noted his weak condition and difficulty moving around. While the trial was several years after the years in issue, we conclude based upon this record that petitioner's condition was substantially similar during the years in issue.

<u>Commissioner</u>, <u>supra</u>; <u>Berman v. Commissioner</u>, T.C. Memo. 1989-654, affd. 925 F.2d 936 (6th Cir. 1991). The Monarch policy provides at least five different payment categories based upon the type of injury suffered. It is not related to the period of time petitioner is absent from work as the policy contemplates that petitioner may engage in any employment or occupation while disabled as a general surgeon. The facts of this case are distinguishable from those cited by respondent. See, e.g., <u>West v. Commissioner</u>, <u>supra</u> (benefits determined by years of "benefit credit"); <u>Berman v. Commissioner</u>, <u>supra</u> (benefits determined by salary and years of service); <u>Beisler v. Commissioner</u>, T.C. Memo. 1985-25, affd. 814 F.2d 1304 (9th Cir. 1987) (benefits determined solely by reference to years in the NFL). We hold petitioner has satisfied the second element of section 105(c) for the Monarch policy.

In reaching our holdings herein, we have considered each argument made by the parties, and, to the extent not discussed above, find those arguments to be irrelevant or without merit. Due to concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155.</u>